IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TIMOTHY JOHN WALES, et al., *Plaintiffs/Appellants*,

*v.*

ARIZONA CORPORATION COMMISSION, *Defendant/Appellee*.

No. 1 CA-CV 19-0345

FILED 6-11-2020

Appeal from the Superior Court in Maricopa County
No. LC2018-000249-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

COUNSEL

Sherman & Howard L.L.C., Scottsdale
By Brian M. Mueller
*Counsel for Plaintiffs/Appellants*

Arizona Corporation Commission, Phoenix
By Paul Kitchin
*Counsel for Defendant/Appellee*

## OPINION

Judge David B. Gass delivered the opinion of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

**G A S S**, Judge:

¶1 The Arizona Corporation Commission found Timothy and Stacey Wales (hereinafter, "the Waleses") offered and sold unregistered securities and ordered payment of restitution, interest, and administrative penalties. Contrary to the Waleses' contentions, the Commission afforded them due process though the Administrative Law Judge (ALJ) who drafted a proposed ruling did not preside over the Waleses' evidentiary hearing. In addition, substantial evidence supports the Commission finding the securities were not exempt from registration and the Commission's restitution order. This court, therefore, affirms the Commission's findings and orders.

## FACTUAL AND PROCEDURAL HISTORY

¶2 In 2007, the Waleses established Visionary Business Works, Inc., an Arizona company specializing in cloud-based fleet management systems. Ms. Wales was its president and Mr. Wales its vice president.

¶3 In 2011, the Waleses approached John W. and Tammi Wight about investing in Visionary. The Wights' company sold medical, dental, and vision insurance to Visionary. The Waleses showed Mr. Wight a spreadsheet projecting Visionary's growth and allowed the Wights to listen in on a few phone calls between Mr. Wales and potential clients. The Wights eventually invested $300,000 in Visionary. Ms. Wight executed a subscription agreement and a separate shares buyback agreement. The subscription agreement memorialized the sale of 25% of Visionary's shares to Ms. Wight. The subscription agreement stated "[t]he shares are being offered in consideration of cash in the aggregate amount of Three Hundred Thousand and No/100 Dollars ($300,000.00) . . . ."

¶4 At about the same time, the Waleses used nearly identical subscription agreements to convey shares to Javier Cano and Jorge de las Casas, two personal friends of the Waleses who sold Visionary's software

internationally. Cano and de las Casas each received 10% of Visionary's stock. Their subscription agreements each stated "[t]he shares are being offered in consideration of cash in the aggregate amount of One Hundred Thirteen Thousand Two Hundred Fifty and No/100 Dollars ($113,250.00)."

¶5        The Waleses did not register the securities they conveyed to the Wights, Cano, or de las Casas. In 2016, the Commission's Securities Division issued a temporary cease and desist order alleging the sales violated A.R.S. §§ 44-1841 and 44-1842, which bar the offer and sale of unregistered securities and the offer and sale of securities by unregistered salespersons. In their response, the Waleses, through counsel, admitted "they sold securities in the form of corporate stock," but alleged the sales were exempt from the registration requirements. The Waleses, however, did not identify the specific exemptions on which they relied.

¶6        The Commission's Hearing Division held an evidentiary hearing, and an ALJ from the Hearing Division (the presiding ALJ) presided. At the evidentiary hearing, the Waleses argued (1) the transactions with Cano and de las Casas were gifts, not sales, and (2) Visionary's stock was exempt from registration under the non-public offering exemption under A.R.S. § 44-1844.A.1. After post-hearing briefing, another ALJ—who had not presided over the evidentiary hearing (the drafting ALJ)—reviewed the record and issued a Recommended Opinion and Order concluding the Waleses sold Visionary stock and failed to show the sales were exempt from registration.

¶7        The Waleses filed written objections to the Recommended Opinion and Order, and the Commission heard oral arguments on the matter as a regular agenda item during an open meeting. During the open meeting, the presiding ALJ answered questions for the Commission. After hearing from the Hearing Division and the Waleses, the Commissioners approved the Recommended Opinion and Order as amended. The final Opinion and Order concluded the Waleses (1) offered and sold unregistered securities and (2) failed to prove the non-public offering exemption applied. *See* A.R.S. §§ 44-1841, 44-1842, 44-2033. The Commission ordered the Waleses to cease and desist offering unregistered securities and to pay $526,500 in restitution, plus interest. The Commission also ordered the Waleses to pay $15,000 in administrative penalties.

¶8        The Waleses timely appealed to the superior court. After briefing and oral argument, the superior court affirmed the Commission's

Opinion and Order. This timely appeal followed. This court has jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. § 12-120.21.

## ANALYSIS

**I.      The Commission's hearing process complied with Arizona law and did not violate the Waleses' due process.**

**¶9**          This court reviews the interpretation of statutes and constitutional provisions *de novo. See Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557, ¶ 7 (App. 2002). To comply with due process, a party must have had notice and "opportunity to be heard at a meaningful time and in a meaningful manner." *Comeau v. Ariz. St. Bd. Of Dental Exam'rs*, 196 Ariz. 102, 106-07, ¶ 20 (App. 1999) (internal quotation omitted). "Due process is not a static concept; it must account for the practicalities and peculiarities of the case." *Id.* at 107, ¶ 20 (internal quotation omitted).

**¶10**          The Waleses argue the Commission's administrative hearing process was legally insufficient and denied them due process because the presiding ALJ did not draft the Recommended Opinion and Order. *See Ohlmaier v. Indus. Comm'n*, 161 Ariz. 113, 117 (1989); *Adams v. Indus. Comm'n*, 147 Ariz. 418, 422 (App. 1985). The cases on which the Waleses rely are distinguishable. In each of those cases, the substitute hearing officer entered a *final* appealable decision. *See Ohlmaier*, 161 Ariz. at 117 (deciding ALJ must be present for expert witness testimony); *Adams*, 147 Ariz. at 422 (deciding ALJ must be present for evidentiary hearings). Here, unlike *Ohlmaier* and *Adams*, the drafting ALJ prepared a *recommended* order that could become effective only upon review and approval by the final decision maker, the Commission. *See Pine-Strawberry Imp. Ass'n v. Ariz. Corp. Comm'n*, 152 Ariz. 339, 340 (App. 1986).

**¶11**          The Waleses are not the first to raise a due process claim based on the Commission's use of ALJs who did not preside over evidentiary hearings to draft proposed orders. *See id.* In *Pine-Strawberry*, the superior court found the Commission violated the parties' due process rights in a rate increase case when it did not have the presiding ALJ draft the recommended order. *See id. Pine-Strawberry* reversed, saying:

> Initially, we hold that the superior court erred in finding that the Commission violated Pine-Strawberry's due process rights. It is well settled that the Commission's hearing staff does not rule on an application for rate

4

increase. The Commission has sole authority for making such a decision and is never bound by the hearing officer's recommendation. The Commission's own rules and regulations dictate that the presiding hearing officer shall only prepare recommendations. This rule governs except as may be otherwise directed by the Commission. In this case, the Commission directed the hearing officer to prepare the proposed order, and even though he did not personally attend the rate hearings, he had the benefit of the recorded testimony. This is sufficient to comply with due process requirements.

*See id.* (internal quotations and citations omitted).

**¶12**        Though the issue here involved a securities violation, the difference is of no legal consequence. The Commission has discretion to direct a hearing officer who did not preside over an evidentiary hearing to draft a recommendation. *See* A.R.S. § 41-1061.F.6; A.A.C. R14-3-110.B. When this court interprets a statute, the primary goal is to give effect to the statute's purpose. *See Parsons v. Ariz. Dep't of Health Servs.*, 242 Ariz. 320, 323, ¶ 11 (App. 2017). This court looks first "to the statute's plain language as the best indicator of" its purpose. *See id.* If the language is clear and unambiguous, this court "must give effect to that language without employing other rules of statutory construction." *Id.*

**¶13**        Subsection 41-1061.F.6. requires the record in a contested case include "[a]ny decision, opinion or report by the officer presiding at the hearing" if that presiding officer in fact created a "decision, opinion or report." It does not impose a duty on the presiding officer—and only the presiding officer—to create a "decision, opinion, or report." *See id.* Further, the Commission may direct another ALJ to create such a "decision, opinion or report." *See* A.A.C. R14-3-110.B ("In a proceeding heard by a Hearing Officer, the Hearing Officer shall prepare his recommendation which may be in the form of an opinion and order, *unless otherwise directed by the Commissioners*." (emphasis added)).

**¶14**        During the Commission's open meeting on the Waleses' case, counsel for the Securities Division explained the reason for this discretion, advising the Commissioners "the Hearing Division is allowed to change the assignment of judges who write opinions . . . to increase efficiency so that decisions can come up promptly." As counsel for the Securities Division explained, the Commission's rules allow this

procedure because the Commissioners are responsible for making the final decision—not the ALJ. *See Pine-Strawberry*, 152 Ariz. at 340.

¶15 Turning to the Waleses' hearing process, the Commission was the final decision-maker. *See id.* The Commission conducted an open meeting. During the open meeting, the Commission confirmed an ALJ who drafts recommendations but who did not preside over a hearing reviews the "record in full." Indeed, the extensive and accurate citations to the record in the Recommended Opinion and Order show the drafting ALJ here in fact reviewed the "record in full." In addition, the presiding ALJ appeared at the Commission's open meeting, answered its questions, offered three amendments to the Recommended Opinion and Order (which the Commission adopted), and otherwise encouraged the Commission to approve the amended Recommended Opinion and Order. The Commission considered the Waleses' written objections to the Recommended Opinion and Order. It heard oral argument from the presiding ALJ, the Securities Division, and the Waleses. Each presented argument about the hearings, the evidence, and the Recommended Opinion and Order. The Commissioners asked appropriate questions, voted to amend the Recommended Opinion and Order, and then independently voted to approve the final Opinion and Order.

¶16 Nothing in the record establishes a due process violation. The Waleses were given appropriate notice of the charges against them when the Commission served the temporary cease and desist order. They filed an answer and were represented by counsel throughout the proceedings, including this appeal. The Hearing Division held a hearing as required by A.R.S. § 41-1061.A. The hearing was electronically recorded and transcribed. *See* A.R.S. § 12-910.C. The Waleses had an opportunity to respond, present evidence, and make arguments on all the issues. *See* A.R.S. § 41-1061.D; A.A.C. R14-3-104.A. The Waleses filed objections to the Recommended Opinion and Order. When the Commission held an open meeting to address the case, it heard from the Waleses before voting to approve the final Opinion and Order.

¶17 Based on the above, the Waleses were given notice and an opportunity to be heard throughout the proceedings. The Commission's process complied with Arizona law and afforded these litigants due process.

**II.    When the Commission found the Waleses offered and sold unregistered securities, its action was not arbitrary, capricious, or an abuse of discretion.**

**¶18**    When considering a challenge to the Commission's decision enforcing securities laws, this court independently reviews the administrative record to determine whether the Commission's action was unlawful, arbitrary and capricious, or an abuse of discretion. *See* A.R.S. § 12-910.E; *Parsons*, 242 Ariz. at 322, ¶ 10. This court considers the evidence in the light most favorable to sustaining the Commission's decision. *Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 459 n.2 (App. 2015).

**¶19**    This court does not reweigh evidence but instead assesses whether substantial evidence supports the decision. *E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, 409, ¶ 35 (App. 2003). Substantial evidence exists if the evidentiary record supports the decision, even if the record would also support a different conclusion. *Id.*; *see also Webster v. State Bd. of Regents*, 123 Ariz. 363, 365-66 (App. 1979). This court reviews the Commission's legal determinations *de novo*. *McGovern v. Ariz. Health Care Cost Containment Sys. Admin.*, 241 Ariz. 115, 118, ¶ 8 (App. 2016).

**A.    The Waleses sold unregistered securities to Cano and de las Casas.**

**¶20**    Generally, the sale of an unregistered security is prohibited. *See* A.R.S. § 44-1841. Here, the Waleses do not dispute the transactions with Cano and de las Casas occurred. They, however, do argue the Cano and de las Casas transactions were not sales but instead were *bona fide* gifts and exempt from registration requirements.

**¶21**    Substantial evidence supports the Commission's finding these transactions were sales. The Waleses argue the stock was a gift. Their contention, however, does not hold up even under their version of the facts. By their own account, the Wales offered Cano and de las Casas the equity interest because Visionary had cash flow problems and no net profit. Beyond that, the subscription agreements said Visionary was offering the stocks in "consideration of cash" from Cano and de las Casas. The subscription agreements further said Visionary "wish[ed] to sell to Shareholder, and Shareholder wish[ed] to purchase from the company . . . the amount of the Shares as indicated on the signature pages."

**¶22**    The Commission ultimately found Visionary offered Cano and de las Casas the stock in consideration for funds they contributed to Visionary over time and the Waleses approximated the value of the

"contributions as being $113,250 from each of them." Based on the above, the Commission did not act arbitrarily, capriciously, or abuse its discretion when it found the Waleses sold stock to Cano and de las Casas. *See* A.R.S. § 12-910.E.

### B. The offers and sales to the Wights, Cano, and de las Casas were not exempt from registration.

**¶23** Unless subject to a statutory exemption, any note, subscription, or certificate of participation in any profit-sharing agreement is a security for registration purposes under Arizona law. A.R.S. § 44-1801.27(a); *see also State v. Tober*, 173 Ariz. 211, 212–14 (1992). Certain limited classes of securities are exempt from the registration requirement, as are certain transactions. *See* A.R.S. §§ 44-1843 (exempt securities), 44-1844 (exempt transactions). Qualifying for exemption requires strict compliance with all aspects of the relevant exemption provision. *See State v. Baumann*, 125 Ariz. 404, 411 (1980). The party urging exemption as a defense has the burden to prove the exemption. A.R.S. § 44-2033.

**¶24** The Waleses argue the transactions were exempt from registration for two reasons. First, they argue the transactions were exempt under the limited public offering exemption. *See* A.A.C. R14-4-126. Second, they argue the transactions were exempt under the non-public offering exemption. *See* A.R.S. § 44-1844.A.1.

### 1. Limited Public Offering

**¶25** The Waleses waived their limited public offering argument by not raising it to the Commission. *Cf. Cont'l Lighting & Contracting, Inc. v. Premier Grading & Utils., LLC*, 227 Ariz. 382, 386, ¶ 12 (App. 2011) (arguments not raised before the trial court are waived on appeal). The Waleses never mentioned the limited offering exemption during the hearing before the Hearing Division or in their written and oral arguments before the Commission. Those words do not even appear in the transcripts. Further, they failed to raise the limited offerings exemption in their post-hearing brief. The subject of accredited investors was discussed at the Commission's hearing, but it was never tied to any argument of a limited offering exemption. The Waleses plainly waived this argument.

**¶26** The absence of evidence the Waleses needed to produce to establish the exemption further supports waiver. This exemption applies to "accredited investors." *See* A.A.C. R14-4-126.B.1. The Waleses argue the Wights were accredited investors under A.A.C. R14-4-126.B.1.e-.f, which would require the Waleses to prove either (1) the Wights had a net worth

exceeding $1,000,000, or (2) for the two years before the transaction, the Wights had a joint annual income in excess of $300,000 or Ms. Wight had an individual annual income in excess of $200,000. The Waleses argue Cano and de las Casas were accredited investors under A.A.C. R14-4-126.B.1.d, which would require the Waleses to prove each was either a "director, executive officer, or general partner" of Visionary. Though Ms. Wight, Cano, and de las Casas all signed subscription agreements saying they were accredited investors, Visionary had an attorney draft the subscription agreements.

¶27 The Waleses have presented no evidence of the Wights' income or net worth. They did not even argue Ms. Wight was in fact an accredited investor. *See* A.A.C. R14-4-126.B.1.e-.f. Instead, they argued Ms. Wight misled them into reasonably believing she was because she signed the subscription agreement. The Commission concluded the evidence, including Ms. Wight's testimony, established Ms. Wight did not know what it meant to be an accredited investor. Ms. Wight, therefore, could not have misled the Waleses by signing the subscription agreement Visionary had its attorney draft. Further, the Waleses offered no evidence to otherwise support a reasonable belief Ms. Wight met the criteria to be an accredited investor. Moreover, the Waleses argued Ms. Wight misled them only in the context of their assertion the transactions were exempt as non-public offerings, not as limited public offerings.

¶28 The case for waiver as to Cano and de las Casas is equally strong. The Waleses never asked the Commission to find Cano and de las Casas were accredited investors because they were officers or directors of Visionary. Indeed, the Waleses never suggested, let alone proved, Cano and de las Casas were accredited investors when the Waleses were before the Hearing Division or the Commission. Instead, the Waleses first mention this argument when they asked the superior court to take judicial notice that Cano and de las Casas were officers. As such the Wales waived the argument.

### 2. Non-Public Offering

¶29 The Waleses next argue the sales are exempt from registration as a non-public offering. *See* A.R.S. § 44-1844.A.1. To establish the exemption, the Waleses had to show strict compliance with all statutory requirements. *See Baumann*, 125 Ariz. at 411. The Waleses did not.

¶30 No Arizona appellate court has interpreted A.R.S. § 44-1844.A.1, which is identical to 15 U.S.C. § 77d(a)(2). Consistent with the purpose of Arizona statutes governing sales of private securities, this court follows settled federal securities law in interpreting Arizona securities statutes. *See* 1996 Ariz. Sess. Laws, ch. 197, § 11(C) (2d Reg. Sess.). The legislature specifically directed this court to do just that, saying "in construing the provisions of title 44, chapter 12, Arizona Revised Statutes, the courts may use as a guide the interpretations given by the securities and exchange commission and the federal or other courts in construing substantially similar provisions in the federal securities laws of the United States." *See id.* (statement of legislative intent); *see also Sell v. Gama*, 231 Ariz. 323, 327, ¶ 18 (2013). Here, the cases construing the identical federal securities law are instructive. *See id.*

¶31 The non-public offering exemption often applies to offerings of stock to a selected group of key employees, enabling them to secure an interest in the company or to increase an interest they already held. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). The exemption applies when those who receive stock have "no practical need for" the protection provided by the Securities Act and registration of stocks. *Id.* at 125. Stock recipients under this exemption should have sufficient knowledge to "fend for themselves" in a transaction not involving the public. *Id.*

¶32 Under the non-public offering exemption, each offeree must have access to, or disclosure of, the type of information proper registration would have revealed. *See id.* at 126-27. The exemption hinges on the knowledge of the offerees, not the intent of the issuers. *Id.* The offeree must have knowledge of the "financial information about the investment, similar to what would be found in a registration statement." *See Sorrel v. SEC*, 679 F.2d 1323, 1326 (9th Cir. 1982). To establish the non-public offering exemption, the Waleses had to show the Wights, Cano, and de las Casas, as the offerees, each had "access to or disclosure of the sort of information about [Visionary] that registration reveals." *See SEC v. Murphy*, 626 F.2d 633, 647 (9th Cir. 1980).

¶33 The Waleses argue they had a "reasonable belief" the offerees had this knowledge. Their unilateral and unsupported belief, however, is not substantial evidence the Wights, Cano, and de las Casas had the requisite knowledge. *See* A.R.S. § 44-2033; *Ralston Purina Co.*, 346 U.S. at 126-27.

¶34 Further, the record shows the offerees did not receive the type of information they would have received in a registration statement.

Before making their investments, none received a written opinion of counsel regarding Visionary, certified balance sheets, or other information about Visionary officer compensation. *See generally* 15 U.S.C. § 77aa (describing the 32 categories of information required in a registration statement). Mr. Wight said he was shown a spreadsheet listing "projections of growth" for Visionary, but he did not recall receiving a copy of the spreadsheet. Further, the Waleses did not provide a written summary of risk disclosures for the offerees. They only included a statement in the subscription agreement saying the stock purchase involved "substantial risks."

**¶35**        Simply put, the offerees needed the protection registration would have provided. The Waleses did not disclose or make available sufficient information for the offerees to adequately assess the risks they were undertaking by buying the stock. The Commission's conclusion the Waleses failed to meet their burden to prove the exemption was neither arbitrary, capricious, or an abuse of discretion.

### III.   The Commission did not abuse its discretion when it ordered the Waleses to pay restitution of $526,500, plus interest and administrative penalties.

**¶36**        The Waleses do not challenge the Commission's interest and administrative penalty calculations. Their argument goes only to the amount of restitution. The Commission calculated restitution at $113,250 to Cano, $113,250 to de las Casas, and $300,000 to the Wights, for a total of $526,500.

**¶37**        The Commission has the authority to order restitution. *See* A.R.S. § 44-2032.1. The purpose of a restitution order in this context is to restore the purchasers of an unregistered security to their original position. *See Hirsch*, 237 Ariz. at 466, ¶ 40. The Commission's rules direct that damages payable to a purchaser "shall include" the "[c]ash equal to the fair market value of the consideration paid, determined as of the date such payment was originally paid by the buyer" plus interest, minus "any principal, interest, or other distributions received on the security" from the day of purchase to the day of repayment. A.A.C. R14-4-308.C.1.

**¶38**        The subscription agreements document Cano and de las Casas each paid Visionary $113,250. The Waleses argue this amount does not reflect Cano and de la Casas' true investment. Essentially, the Waleses ask this court to reweigh the evidence, which it will not do. *See E. Vanguard*, 206 Ariz. at 409, ¶ 35. Substantial evidence supports the

Commission's order. Ms. Wales testified she and Mr. Wales arrived at $113,250 based on the value of the contributions Cano and de las Casas previously made to Visionary and offered Cano and de las Casas the equity interest because Visionary had cash flow problems and no net profit.

¶39 The restitution order is in line with the Commission's rules on restitution and supported by substantial evidence. The Waleses agree the Wights invested $300,000 in Visionary but argue the Wights made a knowing misrepresentation regarding their status as "accredited investors" during the sale process. The Commission did not agree. As explained above, substantial evidence supports the Commission's findings that the Wights did not know what it meant to be an "accredited investor."

¶40 The Commission followed its own rules when calculating the restitution owed and did not abuse its discretion.

## ATTORNEY FEES ON APPEAL

¶41 The Waleses request attorney fees under A.R.S. § 12-348.A. Because they did not prevail, this court denies their request.

## CONCLUSION

¶42 This court affirms the Commission's final Opinion and Order.



AMY M. WOOD • Clerk of the Court
FILED: AA

12